# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

---

In re:

**Isaacson Structural Steel, Inc.**

Debtor

CHAPTER 11

Case No. 11-12416-JMD

---

### DEBTOR'S MOTION FOR ORDER
### AUTHORIZING DEBTOR TO ENTER INTO WORKING CAPITAL FINANCING
### ARRANGEMENT WITH CATE STREET CAPITAL, INC.

Debtor in possession, **Isaacson Structural Steel, Inc.** (the "Debtor" or "ISSI")

respectfully moves this Court as follows:

### INTRODUCTION

1.      Pursuant to Sections 105, 364 and 506 of the Bankruptcy Code, Debtor requests

this Court to issue and enter an order which authorizes Debtor to enter into a working capital

financing arrangement with Cate Street Capital, Inc. ( the "Lender") in the maximum amount of

$500,000 (the "Financing" or "Financing Arrangement") on the terms and conditions set forth in

the Loan Agreement attached hereto including each of its exhibits, Note and all others

documents memorializing the Financing whether attached hereto or not ( the "Financing

Documents")[1].  The Financing Documents are attached hereto as Exhibits A through D.  The

Financing will (i) bear interest at the rate of 5.25%, (ii) be due and payable in full upon the

earlier of (a) September 30, 2011; (b) from the proceeds of collateral for the Financing, or (c)

from the proceeds of the $2,250,000 Financing expected to be made by New Hampshire

Business Finance Authority and NCIC through a New Market Tax Credits financing transaction

described more fully on the Financing Documents ( the "BFA Financing") and (iii) be secured

by:  (a) a pledge of, and a first priority, security interest in, the Collateral Contracts and all of

the Borrower's accounts receivable, inventory, raw materials and work in process related to, or

---

[1] All capitalized terms not defined herein shall have the meaning ascribed in the Loan Agreement attached hereto as Exhibit A.

associated with, the Collateral Contracts; and (b) a first priority security interest in, and a right to repayment from, the proceeds of a loan in the amount of approximately $2,250,000 to be made to Borrower pursuant to the BFA Financing; and (c) a first priority security interest in all proceeds of the Loan; and (d) all Property described in any Security Document included within the Financing Documents, as security for any Obligations, and all other Property that now or hereafter secures (or is intended to secure) any Obligations; and (e) whether now owned or hereafter acquired or arising, and all proceeds and products of the property identified in clauses (a) through (d) above (items (iii) (a) through (e) are hereinafter collectively referred to as the "Collateral"). The Lender shall be entitled to the protections afforded a first position secured creditor holding a perfected lien senior to all others, pursuant to Code Section 364(d)(1) in regard to the Collateral described in items (iii) (a) through (e), except in regard to item (iii)(d) such security interest shall only be of a senior priority under Code Section 364(d)(1) to the extent the Collateral is otherwise unencumbered and shall if otherwise encumbered receive treatment under Code Section 364(c)(3). Lender will also be granted an allowed claim with priority over all administrative expenses of the kind specified in Code Section 503 pursuant to Code Section 503 (b)(1) and (2) to the extent allowed by this Court, except for any claims asserted by Debtor's counsel not to exceed the amount specified in the final order entered by this Court (the "limited superpriority"). Notwithstanding the entry of an order granting Debtor the relief requested herein in whole or in part, the proceeds of the Financing shall not be used to pay any claims held or asserted by professionals retained by Debtor without the specific approval thereof by this Court.

2.	The Lender has conditioned the Financing on confirmation of the following items in the financing order approving the Financing, if any:

> All rights and remedies provided for in the Financing Documents shall be specifically approved in the financing order, including the establishment and priority of the security interests and liens therein described and as provided above;

> The Lender shall be authorized to terminate the Financing, cease making any additional advances or loans to the Debtor and exercise all remedies set forth in the

Financing Documents immediately upon the occurrence of a "Default" as described in the Financing Documents, and the automatic stay shall immediately be lifted with respect to all actions authorized upon Default under the Financing Documents, including all remedial actions provided under Financing Documents;

➢ The Debtor shall be prohibited from use of Lender's cash collateral after Default or termination as defined in the Financing Documents;

➢ The Lender shall be found to be acting in good faith as described in 364(e) of the Bankruptcy Code and accorded all protections provided thereunder;

➢ The Lender's collateral shall not be subject to statutory charges for preservation or disposition under Section 506(c) of the Bankruptcy Code; and

➢ The financing order shall be explicitly binding on Debtor's successors, including any trustee appointed in this proceeding or any subsequent Chapter 7 case.

➢ Debtor shall segregate the proceeds of the Collateral entitled to treatment under Code Section 364(d)(1).

3.     A proposed order granting Debtor the relief requested herein accompanies this Motion.

## RELEVANT PROCEDURAL HISTORY

4.     On June 22, 2011, Debtor filed the Voluntary Petition, which began this case (the "Petition Date" and "Voluntary Petition"). An order for relief entered on the same date. As of this date, Debtor has not yet filed the Statement of Financial Affairs ("SOFA") and Schedules A – G and the Summary of Property and Liabilities.

5.     An Official Committee of Unsecured Creditors has been appointed by the United States Trustee.

## NEED FOR WORKING CAPITAL

5.     Debtor is a corporation, which is engaged in the business of fabricating steel for use in construction projects. It employs approximately 165 people at its Berlin, New Hampshire facility. The Debtor needs a $500,000 bridge Financing to fund its operations while the so-called Liberty Mutual/Turner and Middletown School/MasterCraft contracts come on line. Attached as Exhibit E is Debtor's projected Operating Budget through September 30, 2011,

which contemplates the assumption or assumption and assignment of the Liberty Mutual/Turner and Middletown School/MasterCraft Contracts, which have a total contract price in excess of $24,000,000. Without the Financing, Debtor will have to suspend its business operations and furlough or lay off employees.

## DEBTOR UNABLE TO OBTAIN UNSECURED CREDIT

6.     Debtor has no property which has more value than the total amount of claims secured by liens of record on its property. Passumpsic Savings Bank alone claims to be owed more than $14,000,000. Except for Passumpsic Savings, no secured creditor has any lien or other interest in Debtor's interest in property of the estate that has any value to the secured creditor.

7.     Passumpsic Savings Bank froze or offset Debtor's operating accounts on June 10, 2011, which deprived Debtor of approximately $930,000. It also caused hundreds of thousands of dollars in checks issued to subcontractors and vendors to be returned for insufficient funds. A dispute exists between Debtor and Passumpsic Savings regarding the propriety of the action or actions taken by Passumpsic Savings. Passumpsic Savings subsequently rejected repeated requests that it honor or pay as conservancy costs checks given to pay even subcontractors and vendors essential to the fulfillment of contracts that constituted a significant part of Passumpsic Savings' limited collateral. Since Passumpsic Savings declined to protect its own collateral, Debtor concluded that it would not lend additional money to Debtor.

8.     Not surprisingly, Debtor's collections of its approximately $1,500,000 in pre-petition accounts receivable have dried up as a result of checks being returned just as it warned Passumpsic Savings. It cannot meet its payroll obligations without closing the Financing. Since Turner and MasterCraft have expressed a general willingness to pay by Joint Check many of the costs and expenses incurred and to be incurred by Debtor in the fulfillment of the Liberty Mutual-Turner Contract and Middletown School/MasterCraft Contract, the Financing will provide

4

adequate funds through September 30, 2011.

9.    Debtor, Lender and Passumpsic Savings have been negotiating the terms of the Financing for at least 2 weeks. The parties have exchanged, reviewed and commented on the Financing Documents, but they may or may not be acceptable to Passumpsic Savings in all respects. According to Passumpsic Savings, it has not been able to consent because of the opposition of the U.S. Small Business Administration.

10.    Except for Lender, Debtor could not find any other person or entity willing to provide a Financing Arrangement in the amount and on the terms offered by Lender or even less favorable terms on a secured basis, an unsecured basis with the benefit of priority over all administrative expenses of the kind specified in Code Section 503(b) or an unsecured basis.

11.    Granting Debtor the relief requested in this Motion will subordinate the liens of record held by Passumpsic Savings to those to be granted to Lender as described in Paragraph 1 above. Passumpsic Savings will not be damaged by the subordination. Passumpsic Savings may benefit if and to the extent Debtor completes one or more pre-petition Contracts.

12.    The limited superpriority may diminish the dividends paid to unsecured creditors.

## TERMS ARE FAIR AND REASONABLE

13.    In the opinion of Debtor, the terms of the proposed Financing are more than fair and reasonable under the circumstances.

14.    The interest rate is less than that charged by lending institutions to all but their most creditworthy customers.

15.    The term of the Financing is sufficient for Debtor to generate significant revenues from the Liberty Mutual-Turner Contract and Middletown School/MasterCraft Contract.

16.    Lender is familiar with the status of the closing of the BioMass project and accepts the risk that the BFA Financing may not close and that a reorganization plan may not

5

be confirmed in this case.

## CONCLUSION

17.    Under the facts and circumstances of this case, this Court should defer to the

Debtor's business judgment.  The Financing terms and conditions are far more favorable to

Debtor then those generally available to Chapter 11 debtors in the marketplace.  A

reorganization will be almost impossible without the proposed Financing.  Clearly, the Financing

benefits Debtor and its estate as a whole.

**WHEREFORE,** Debtor respectfully requests this Court to issue and enter the proposed

Order accompanying this Motion and grant Debtor such further relief as may prove to be

equitable, fair, just and lawful under the circumstances.

Respectfully submitted,
ISAACSON STRUCTURAL STEEL, INC.

By its attorneys

Dated: July 1, 2011            /s/ William S. Gannon
                               William S. Gannon, Esquire

WILLIAM S. GANNON PLLC
889 Elm Street, 4th Floor
Manchester NH 03101
(603) 621-0833
bgannon@gannonlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date I served the foregoing pleading on each person named
below by causing it to be filed electronically via the CM/ECF filing system or mailed by first-class
United States Mail, postage pre-paid, or in such other manner as may be indicated:

All Persons on the attached Service Lists (if any).

DATED:  July 1, 2011            /s/ Mary Ann Joyce
                                Mary Ann Joyce

W:\Clients\ISSI\BANKRUPTCY\DRAFTS\00032294.DOC

**APPEARANCES SERVICE LIST**
**In Re: Isaacson Structural Steel, Inc., Chapter 11, Case No. 11-12416-JMD**

Ann Marie Dirsa - **ECF**
Assistant U.S. Trustee

Gregory Moffett – ECF
For Passumpsic Savings Bank

Internal Revenue Service
Special Procedures Function
80 Daniel
PO Box 9502
Portsmouth  NH  03802

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia PA 19101-7346

State of New Hampshire
Dept. of Employment Security
Attn: Arnold Rocklin-Weare
32 South Main Street
Concord, NH 03301

7

**CREDITORS' COMMITTEE SERVICE LIST**
**In re Isaacson Structural Steel, Inc., Chapter 11, BK-11-12416-JMD**

Timothy M. Riley, Trustee
The Eli Isaacson Family Trust
c/o The Harbor Group - Bedford Commons
402 Riverway Place
Bedford, NH 03110
(603) 628-0634 phone
(603) 668-4561 fax
Email: triley@harborgrp.com

Mr. Gerard Bellavance, Secretary
United Steel Erectors, Inc.
P.O. Box 3
Wolcott, VT 05680
(802) 472-6146 phone
fax: none
Email: useigerard@gmail.com

Charles Fenderson, President
Charles Leonard Construction, Inc.
183 Pembroke Road
Concord, NH 03252
(603) 225-0211 phone
(603) 225-0325 fax
Email: charles@charlesleonardinc.com

Mr. Daryll Bridges, Vice President
James F. Stearns Co., Inc.
42 Winter Street
Pembroke, MA 02359
(781) 829-0098 phone
(781) 829-0092 fax
Email: dbridges@jfstearns.com

Mr. Kevin Tote, Credit Manager
Namasco Corporation
760 Newfield Street
Middletown, CT 06457
(860) 398-5224 phone
(860) 398-4178 fax
Email: ktoto@namasco.com

EXHIBIT

tabbies

*A*

# LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement") is made as of ____, 2011, by and between Isaacson Structural Steel, Inc., a New Hampshire corporation ("Borrower") and Cate Street Capital, Inc., a Delaware corporation ("Lender").

### 1.     DESCRIPTION OF THE LOAN.

a.     <u>Loan Subject to Agreement</u>.  This Agreement sets forth the terms and conditions governing a short-term bridge loan ("Loan") from Lender to the Borrower, as debtor-in-possession in the Bankruptcy Proceedings (as defined herein) in the amount of up to Five Hundred Thousand Dollars ($500,000), evidenced by a Commercial Promissory Note dated _____, 2011, which is attached hereto as <u>Exhibit A</u> (the "Note").  This Agreement shall also govern any other note that specifically refers to this Agreement.

b.     <u>Security</u>.  This Agreement is secured by (i) that certain Security Agreement, dated as of ____, 2011, by and between the Borrower and the Lender, which is attached hereto as <u>Exhibit B</u> (the "Security Agreement"), and (ii) by any other mortgage, security agreement, guarantee, or other security document that either: (A) specifically refers to this Agreement or any similar agreement, or (B) generally secures all obligations of the Borrower to Lender.

c.     <u>Intercreditor Agreement</u>.  Lender's willingness to enter into this Agreement is contingent upon the execution of that certain Intercreditor Agreement by Borrower's senior lender, the form of which is attached hereto as <u>Exhibit C</u> (the "Intercreditor Agreement").

d.     <u>Financing Order</u>.  This Agreement, the Note, Security Agreement, Intercreditor Agreement and any ancillary documents and agreements are entered into and the Loan is made conditioned upon entry of and pursuant to a Financing Order entered by the United States Bankruptcy Court for the District of New Hampshire in the Bankruptcy Proceeding dated _____, 2011 (the "Financing Order") in form and substance satisfactory to Lender.

### 2.     DEFINITIONS.

The following terms shall have the meanings set forth below.  Capitalized terms used but not defined herein shall have the meaning ascribed to those terms in the Bankruptcy Code or the Uniform Commercial Code, as applicable.

a.     <u>Account</u> - as defined in the UCC, including all rights to payment for goods sold or leased, or for services rendered.

b.	Account Debtor - a Person who is obligated under an Account, Chattel Paper or General Intangible.

c.	Affiliate - with respect to any Person, another Person (a) who directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such first Person; (b) who beneficially owns 10% or more of the voting securities or any class of Equity Interests of such first Person; (c) at least 10% of whose voting securities or any class of Equity Interests is beneficially owned, directly or indirectly, by such first Person; or (d) who is an officer, director, partner or manager of such first Person; provided that, for purposes of this Agreement, the Lender shall not be deemed to be an Affiliate of the Borrower or any Subsidiary. "Control" means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through ownership of Equity Interests, by contract or otherwise.

d.	Bankruptcy Code - Title 11 of the United States Code, 11 U.S.C. §§101 et seq., as amended.

e.	Bankruptcy Proceeding – The Chapter 11 case pending in United States Bankruptcy Court for the District of New Hampshire docketed as "In re Isaacson Structural Steel, Inc., Case No.11−12416, and any subsequent Chapter 7 case, if any."

f.	BFA Financing Commitment. The commitment set forth in a letter from the New Hampshire Business Finance Authority to Borrower dated June 24, 2011, attached hereto as Exhibit K.

g.	Borrower. Isaacson Structural Steel, Inc.

h.	Collateral. Means (i) a pledge of, and a first priority security interest in, the Collateral Contracts and all of the Borrower's accounts receivable, inventory, raw materials and work in process related to, or associated with, the Collateral Contracts; and (ii) a first priority security interest in, and a right to repayment from, the proceeds of a loan in the amount of approximately $2,250,000 to be made to Borrower pursuant to the BFA Financing Commitment; and (iii) a first priority security interest in all proceeds of the Loan; (iv) all Property described in any Security Documents as security for any Obligations, and all other Property that now or hereafter secures (or is intended to secure) any Obligations; whether now owned or hereafter acquired or arising, and all proceeds and products of the property listed in clauses (i) through (iv) above.

i.	Collateral Contracts – means the agreements between Borrower and third parties listed in Exhibit J attached hereto and incorporated herein by reference.

j.	Default. See Section 8.

k.	Encumbrances. Any mortgage, pledge, security interest, lien or other charge or encumbrance, including the lien or retained security title of a conditional vendor

upon or with respect to any of the property or assets of the Borrower or any of its Subsidiaries.

l.      <u>Indebtedness</u>. All obligations, fixed, contingent or otherwise, that in accordance with generally accepted accounting principles should be classified upon the obligor's balance sheet as liabilities, or to which reference should be made by footnotes thereto, including in any event and whether or not so classified: (a) all debt and similar monetary obligations, whether direct or indirect; (b) all liabilities secured by any mortgage, pledge, security interest, lien, charge, or other encumbrance existing on property owned or acquired subject thereto, whether or not the liability secured thereby shall have been assumed; and (c) all guarantees, endorsements and other contingent obligations whether direct or indirect in respect of indebtedness of others.

m.      <u>Investments</u>. All expenditures made and all liabilities incurred (contingently or otherwise) for the acquisition of stock or Indebtedness of, or for loans, advances, capital contributions or transfers of property to, or in respect of any guaranties (or other commitments as described under Indebtedness) or obligations of, any person.

n.      <u>Lien</u> - any Person's interest in property securing an obligation owed to, or a claim by, such Person, whether such interest is based on common law, statute or contract, including liens, security interests, pledges, hypothecations, statutory trusts, reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting property.

o.      <u>Loan Documents</u>. This Agreement, the Note, the Intercreditor Agreement, the Security Agreement and all other Security Documents, and any other documents relating to the Loan or the transactions contemplated hereby, as the same may be amended, modified or supplemented from time to time.

p.      <u>Loan</u>. The loans to be made from time to time to the Borrower under the Agreement and the Note.

q.      <u>Obligations</u>. The obligations of the Borrower under the Note, this Agreement, any other note or agreement to repay loans governed by this Agreement, any other Loan Document and under the Security Documents.

r.      <u>Permitted Uses</u> – Means expenditures required to fund the performance of Collateral Contracts, including acquisition of raw material and payment of production costs specifically identified to the collateral Contract.

s.     <u>Person</u> - any individual, corporation, limited liability company, partnership, joint venture, joint stock company, land trust, business trust, unincorporated organization, Governmental Authority or other entity.

t.     <u>Property</u> - any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

u.     <u>Security Documents</u>. Any mortgage, security agreement, pledge agreement, guaranty and any other document securing the Obligations and all documents relating thereto, including, without limitation, the documents identified in Section 1(b) above, and UCC-1 financing statements, executed and delivered in connection therewith, as the same may be amended, modified or supplemented from time to time.

v.     <u>Subsidiary</u>. Any corporation, association, partnership, trust, or other business entity of which the designated parent shall at any time own directly, or indirectly through a Subsidiary or Subsidiaries, at least a majority (by number of votes or controlling interests) of the outstanding voting interests.

w.     <u>UCC</u> - the Uniform Commercial Code as in effect in the State of New Hampshire or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

3.     **ESTABLISHMENT OF CREDIT LOAN.** The Lender agrees, subject to the terms and conditions herein set forth and in reliance on the representations and warranties set forth herein and in reliance on the Financing Order, to provide the following short-term bridge loan to the Borrower (the "Loan"):

a.     <u>Amount.</u> Five Hundred Thousand Dollars ($500,000).

b.     <u>Advances.</u> Upon satisfaction of the conditions set forth below, Lender shall advance to Borrower the full amount of the Loan, less all fees and expenses incurred by Lender in connection with the establishment and documentation of the Loan, including attorneys' fees, on or about the date hereof. Any amount repaid on the Loan shall not be readvanced. The conditions for advancing the Loan are:

(i) Borrower shall have complied with all of the terms, conditions and requirements of this Agreement, and there exists no default under this Agreement, the Note or any of the Loan Documents;

(ii) the Financing Order shall have been entered in the Bankruptcy Proceeding in form and substance satisfactory to Lender;

(iii) Borrower shall have provided to Lender evidence satisfactory to Lender that Mr. Hanson and Mr. Griffin have made equity contributions to the Borrower on or about the date hereof in an amount no less than Fifty Thousand Dollars ($50,000); and

(iv) Borrower has obtained all third-party consents necessary to effect the transactions contemplated by the Loan Agreement.

On the date hereof, Lender shall issue a payment in the amount of Twenty Five Thousand Dollars ($25,000) on Borrower's behalf, via certified check or wire transfer, to Gallagher, Flynn & Company, LLP ("GF") to be retained by GF and applied for payment of accounting and audit services to be rendered to or for the benefit of Borrower, and Lender shall make a payment to Pierce Atwood LLP for its fees in connection with the negotiation and preparation of Loan documentation, both of which amounts shall be considered advances under the Loan.

In the event funds are advanced in more than one advance, the Lender reserves the right at the time of each advance to request evidence satisfactory to it that, there exists no default or event of default under this Agreement, the Note or any of the Loan Documents.

c. Protective Advances. Lender shall be authorized, in its discretion, at any time that a Default exists and without regard to the principal amount of the Loan to make advances ("Protective Advances") (a) if Lender deems such Protective Advances necessary or desirable to preserve, protect or otherwise realize upon any Collateral, or to enhance the collectibility or repayment of Obligations; or (b) to pay any other amounts chargeable to Obligors under any Loan Documents, including costs, fees and expenses. All Protective Advances shall be Obligations, secured by the Collateral, and shall be treated for all purposes as collection expenses pursuant to the Note. Lender's determination that funding of a Protective Advance is appropriate shall be conclusive.

4.   **ADMINISTRATION OF COLLATERAL.**

a.   Contact Status Report. Borrower shall deliver to Lender a Contract Status Report (i) on the fifteenth day of each month (or if such day is not a Business Day, on the next Business Day), prepared as of the last Business Day of the previous month, (ii) at such other times as Lender may request detailing the status of each Collateral Contract, as of the such dates, including the following information:

(i)  the progress of the work being performed pursuant to each Collateral Contract;

(ii)  identification of goods to each Collateral Contract;

(iii) raw materials ordered or purchased for each Collateral Contract, including the relevant identification information for such materials (including vendor, type of materials, cost, purchase order numbers, invoice numbers and all other relevant information used by Borrower to identify raw materials to contracts generally;

(iv) status of all work in process pursuant to the Collateral Contracts;

(v) status of anticipated and actual delivery dates and deliveries of goods, services or other products pursuant to each Collateral Contract; and

(vi) an accounting of billing, collection and payment on all Accounts related to the Collateral Contracts, including a sales and collections report, in form satisfactory to Lender. Borrower shall also provide to Lender a detailed aged trial balance of all Accounts of Borrower related to the Collateral Contracts specifying each Account's name and address, amount, invoice date and due date, showing any discount, allowance, credit, authorized return or dispute, and including such proof of delivery, copies of invoices and invoice registers, copies of related documents, repayment histories, status reports, concentration and exposure reports with respect to Borrower's Account Debtors and other information as Lender may reasonably request.

b. Records and Schedules of Accounts. Borrower shall keep accurate and complete records relating to the Collateral Contracts, including acquisition of goods or raw materials, work in process, Inventory and Accounts related to Collateral Contracts.

c. Taxes. If an Account of Borrower related to Collateral Contracts includes a charge for any Taxes and Borrower does not promptly or timely pay the amount thereof to the relevant taxing authority, Lender is authorized, in its discretion, to pay the amount thereof to the proper taxing authority for the account of Borrower and to charge Borrower therefor; provided, however, that Lender shall not be liable for any Taxes that may be due from Borrower or with respect to any Collateral.

d. Collateral Contract and Account Verification. Whether or not a Default exists, Lender shall have the right at any time, in the name of Lender, any designee of Lender or Borrower to verify the validity, amount or any other matter relating to any Collateral Contract or associated Accounts of Borrower by mail, telephone or otherwise. Borrower shall cooperate fully with Lender in an effort to facilitate and promptly conclude any such verification process. So long as no Default has occurred and is continuing, Lender shall include Borrower in any communication with any Account Debtor and shall use reasonable efforts to conduct any such communication in a manner so as not to materially interfere with Borrower's business relationship with such Account Debtor.

5. **REPRESENTATIONS AND WARRANTIES.** In order to induce Lender to enter into this Agreement and to make the Loan, the Borrower, by signing below, makes each of the following representations and warranties to Lender:

a. <u>Incorporation; Good Standing</u>. The Borrower (i) is duly organized and validly existing and in good standing under the laws of its jurisdiction of organization; (ii) has all requisite power to own its property and conduct its business as now conducted and as presently contemplated; and (iii) is in good standing as a foreign entity and is duly authorized to do business in each jurisdiction where such qualification is necessary except where a failure to be so qualified in such other jurisdiction would not have a materially adverse effect on the business, or financial condition of the Borrower.

b. <u>Authorization</u>. The execution, delivery and performance of this Agreement and the other Loan Documents to which the Borrower is to become a party and the transactions contemplated hereby and thereby: (i) are within the authority of the Borrower, (ii) have been duly authorized by all necessary action and proceedings; (iii) do not conflict with or result in any breach or contravention of any provision of law, statute, rule or regulation to which the Borrower is subject or any judgment, order, writ, injunction, license or permit applicable to the Borrower, and (iv) do not conflict with any provision of the Borrower's organizational documents or other charter documents or bylaws of, or any agreement or other instrument binding upon the Borrower.

c. <u>Enforceability</u>. The execution and delivery of this Agreement and the other Loan Documents to which the Borrower is or is to become a party will result in valid and legally binding obligations of the Borrower, enforceable against the Borrower in accordance with the respective terms and provisions thereof. No event of default exists under this Agreement nor under any Loan Document, nor does any condition exist which, with the passage of time or the giving of notice (or both), will ripen into an event of default.

d. <u>Governmental Approvals</u>. The execution, delivery and performance by the Borrower of the Agreement and the other Loan Documents and the transactions contemplated thereby do not require the approval or consent of, or filing with, any governmental agency or authority other than those already obtained and the filing of the Security Document and related financing statements in the appropriate records office with respect thereto.

e. <u>Litigation</u>. Except as stated on <u>Exhibit D</u> there are no actions, suits, proceedings or investigations of any kind pending or threatened against the Borrower or any of its Subsidiaries before any court, tribunal or administrative agency or board that, if adversely determined, might, either in any case or in the aggregate,

materially adversely affect the properties, assets, financial condition or business of the Borrower or any of its Subsidiaries or materially impair the right of the Borrower and its Subsidiaries to carry on business substantially as now conducted by it, or result in any substantial liability not adequately covered by insurance, or for which adequate resaves are not maintained on the balance sheet of the Borrower, or which question the validity of this Agreement or any of the other Loan Documents, or any action taken or to be taken pursuant hereto or thereto.

f.      <u>No Materially Adverse Contracts, Etc.</u>  Neither the Borrower nor any of its Subsidiaries is subject to any charter, corporate or other legal restriction, or any judgment, decree, order, rule or regulation that has or is expected in the future to have a materially adverse effect on the business, assets or financial condition of the Borrower or its Subsidiaries.  Neither the Borrower nor any of its Subsidiaries is a party to any contract or agreement that has or is expected, in the judgment of the Borrower's officers, to have any materially adverse effect on the business of the Borrower or its Subsidiaries.

g.      <u>Compliance With Other Instruments, Laws, Etc.</u>  Neither the Borrower nor any of its Subsidiaries is in violation of any provision of its charter or other organizational documents, by-laws, or any agreement or instrument to which it may be subject or by which it or any of its properties may be bound or any decree, order, judgment, statute, license, rule or regulation, in any of the foregoing cases in a manner that could result in the imposition of substantial penalties or could materially and adversely affect the financial condition, properties or business of the Borrower or its Subsidiaries.

h.      <u>Title to Properties; Absence of Encumbrances</u>.  The Borrower and its Subsidiaries have good and marketable title to all of the properties, assets and rights of every name and nature now purported to be owned by them, free from all Encumbrances except or those Encumbrances disclosed in <u>Exhibit E</u> hereto ("Permitted Encumbrances"), and, except as so disclosed, free from all defects of title that might materially adversely affect such properties, assets or rights, taken as a whole.

i.      <u>Financial Statements.</u>  The Borrower has furnished Lender its consolidated balance sheet as of the Balance Sheet Date and other financial statements.  All such financial statements were prepared in accordance with generally accepted accounting principles applied in a consistent basis throughout the periods specified and present fairly the financial position of the Borrower and its Subsidiaries as of such dates and the results of the operations of the Borrower and its Subsidiaries for such periods.  There are no liabilities, contingent or otherwise, not disclosed in such financial statements that, taken in the aggregate, could have a material adverse effect on the Borrower and its Subsidiaries or any of their property.

j. <u>Changes</u>. Since the date of the most recent financial statements referred to in the preceding paragraph, there have been no changes in the assets, liabilities, financial condition, business or prospects of the Borrower or any of its Subsidiaries other than changes in the ordinary course of business, the effect of which has not, in the aggregate, been materially adverse.

k. <u>Taxes</u>. The Borrower and each Subsidiary have filed all federal, state and other tax returns required to be filed, and all taxes, assessments and other governmental charges due from the Borrower and each Subsidiary have been fully paid. The Borrower and each Subsidiary have established on their books reserves adequate for the payment of all federal, state and other tax liabilities.

l. <u>Finance Order</u>. The Finance Order has been entered in the Bankruptcy Proceeding without amendment or modification and no request for a stay or appeal has been filed.

6. **AFFIRMATIVE COVENANTS.** In order to induce Lender to enter into this Agreement, the Borrower, by signing below, makes each of the following affirmative covenants with Lender:

a. <u>Maintenance and Insurance</u>. The Borrower and its Subsidiaries shall maintain its properties in good repair, working order and condition as required for the normal conduct of its business. The Borrower and its Subsidiaries shall at all times maintain liability and casualty insurance with financially sound and reputable insurers in such amounts as the Borrower's officers in the exercise of their reasonable judgment deem to be adequate. In the event of failure to provide and maintain insurance as herein provided, Lender may, at its option, provide such insurance and charge the amount thereof to the account of the Borrower or any of its Subsidiaries with Lender. The Borrower shall furnish to Lender certificates or other evidence, in form and substance satisfactory to Lender, of compliance with the foregoing insurance provisions.

b. <u>Taxes</u>. The Borrower shall pay or cause to be paid all taxes, assessments or governmental charges on or against it or any of its Subsidiaries or its or their properties on or prior to the time when they become due; provided that this covenant shall not apply to any tax, assessment or charge: (i) that is being contested in good faith by appropriate proceedings, (ii) with respect to which adequate reserves have been established and are being maintained in accordance with generally accepted accounting principles, and (iii) that is not subject to enforcement by foreclosure or execution of any lien securing such tax, assessment or charge while said contest is pending.

c. <u>Financial Information</u>. So long as the Obligations are outstanding, the Borrower shall submit to the Lender no later than the 15th day of each month the following

financial statements relating to the preceding month (1) unaudited balance sheet as of the end of the preceding month, (2) unaudited statement of profits and losses for the preceding month, and (3) unaudited statement of cash flows for the preceding month. Borrower shall also furnish to lender all financial statements and other information which Borrower is required to provide to its senior lender.

d.    <u>Inspection by Lender</u>. The Borrower shall permit Lender or its designee, at any reasonable time and upon reasonable notice (or if a Default shall have occurred and is continuing, at any time and without prior notice) to (i) visit and inspect the properties of the Borrower and its subsidiaries, (ii) examine and make copies of and take abstracts from the books and records of the Borrower and its Subsidiaries, and (iii) discuss the affairs, finances and accounts of the Borrower and its Subsidiaries with their appropriate officers, employees and accountants.

e.    <u>Indemnity</u>. Borrower agrees to indemnify Lender and each of the Lender's directors, officers and employees and each other person, if any, who controls Lender and to hold Lender and such other persons harmless from and against all losses, claims, damages, liabilities and expenses (including expenses of litigation or preparation therefor) which Lender or such other persons may incur or which may be asserted against Lender or such other persons in connection with or arising out of the matters referred to in this Agreement, including, without limitation, any liability or assertion of liability arising under any Environmental Law.

f.    <u>Creation and Administration of New Account</u>. Borrower represents that it has created a new bank account [insert account no. routing no., etc.] (the "New Account") with its senior lender, Passumpsic Savings Bank, and agrees to maintain said account for the sole purposes of

        (i) receiving any draws made pursuant to this Agreement under the Note; and

        (ii) receiving any and all payments made on Accounts related to Contract Collateral or otherwise resulting from the sale or disposition of any Collateral; and

        (iii) receiving the proceeds of any loan made pursuant to the BFA Financing Commitment.

        Borrower shall not transfer any proceeds from the Loan out of the New Account other than amounts transferred to the Borrower's existing operating account [insert account no. routing no., etc.] for the sole purpose of paying the cost of Permitted Uses (a "Fund Transfer") and that any payments made out of the proceeds of any Fund Transfer are required to be paid on the same date as the Fund Transfer occurs.

10

Any amounts deposited in the New Account pursuant to subsections (ii) and (iii) above shall be immediately applied to the repayment of any and all amounts outstanding under the Loan, including principal, interest and other fees, charges and expense reimbursement.

g. Borrower shall specifically identify all raw material, work in process and inventory to the contract/project to which it applies, and shall directly and specifically track and include in its Contract Status Reports an itemized report of all amounts incurred with respect to Collateral Contracts.

7. **NEGATIVE COVENANTS.** In order to induce Lender to enter into the Agreement, the Borrower, by signing below, makes each of the following negative covenants with Lender.

a. Encumbrances. Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or suffer to exist any Encumbrances, or assign or otherwise convey any right to receive income, including the sale or discount of accounts receivable with or without recourse, except Permitted Encumbrances.

b. Transfers of Funds. The Borrower will not make any loans, advances or payments of money, other than salaries, commissions and normal reimbursable expenses incurred in the ordinary course of the Borrower's business, to officers, directors, employees, stockholders or affiliates of the Borrower.

c. Merger; Consolidation; Sale or Lease of Assets. Neither the Borrower nor any of its Subsidiaries shall sell, lease or otherwise dispose of assets or properties (valued at the lower of cost or market), other than: (a) sales of inventory in the ordinary course of business, (b) sales of used assets being replaced in the ordinary course of business, and (c) sales of assets no longer required for the conduct of their business having a value less than five percent (5%) in the aggregate of consolidated net worth in any year, nor liquidate, merge or consolidate into or with any other person or entity, provided that any Subsidiary of the Borrower may merge or consolidate into or with: (i) the Borrower if no Default has occurred and is continuing or would result from such merger and if the Borrower is the surviving company, or (ii) any other wholly-owned Subsidiary of the Borrower.

d. Equity Distributions. The Borrower shall not pay any dividends on any class of its capital stock or make any other distribution or payment on account of or in redemption, retirement or purchase of such capital stock; provided that this paragraph shall not apply to the issuance, delivery or distribution by the Borrower of shares of its common stock pro rata to its existing shareholders. If the Borrower is an "S Corporation" as that term is defined in Section 1361 of Title 26 of the United States Code (the "Internal Revenue Code"); then within the first two months of each calendar year the Borrower may distribute up to thirty-five

percent (35%) of its taxable income as defined in the applicable section(s) of the Internal Revenue Code for the previous year to its shareholders.

f.     <u>Investments</u>.  The Borrower will not, directly or indirectly, redeem, invest in, purchase or otherwise acquire, or contract to purchase or otherwise acquire, the securities or stock of any entity, including without limitation, the Borrower's own securities or stock in the property, assets, or business of any other person, firm, partnership or corporation.

g.     <u>Indebtedness</u>.  Neither the Borrower nor any of its Subsidiaries shall create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness other than the following:

    (i)     Indebtedness of the Borrower or any of its Subsidiaries to Lender or any of its affiliates;

    (ii)     Indebtedness existing as of the date of this Agreement and disclosed on <u>Exhibit F</u> hereto;

    (iii)     other Indebtedness of the Borrower in an aggregate outstanding principal amount not exceeding the Other Indebtedness Limit;

    (iv)     guarantees in favor of Lender or any of its affiliates;

    (v)     guarantees existing on the date of this Agreement and disclosed on <u>Exhibit G</u> hereto;

    (vi)     guarantees resulting from the endorsement of negotiable instruments for collection in the ordinary course of business;

    (vii)     guarantees with respect to surety, appeal, performance and return-of-money and other similar obligations incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money); and

    (viii)     guarantees of normal trade debt relating to the acquisition of goods and supplies.

h.     <u>Leases</u>.  Neither the Borrower nor any of its Subsidiaries shall during any fiscal year enter into any leases of real or personal property as lessee, except for Capital Leases or such leases as described on <u>Exhibit H</u>.

i.     <u>Capital Expenditures</u>.  Neither the Borrower nor any of its Subsidiaries shall purchase or agree to purchase, or incur any obligations (including that portion of the obligations arising under Capital Leases that is required to be capitalized on

the consolidated balance sheet of the Borrower and its Subsidiaries) for, any equipment or other property constituting fixed assets in any fiscal year in excess of the Capital Expenditures Limit.

**8.      EVENTS OF DEFAULT:** The following shall be events of default under this Agreement (each referred to herein as a "Default"):

a.      Failure by Borrower, or by any co-obligor, endorser, guarantor or surety for or under any of the Obligations (each referred to herein as a "Co-Obligor"), to make full and prompt payment when due, of any amount required to be paid to Lender under any of the Loan Documents or any other agreement;

b.      Failure by Borrower or any Co-Obligor to perform, keep or observe any term, provision, condition, covenant, agreement, warranty or representation contained in any of the Loan Documents or any other agreement with or in favor of Lender, which failure continues for ten (10) days after notice thereof by Lender to the person or entity required to perform, keep or observe such term, provision, condition, covenant, agreement, warranty or representation;

c.      If any representation, statement, report or certificate made or delivered by Borrower or any Co-Obligor is false or incorrect in any material respect when made or delivered;

d.      The occurrence of any one or more of the following events, transactions or occurrences:

    i.   The appointment of a trustee in the Chapter 11 Bankruptcy Proceeding;
    ii.  The dismissal of the Bankruptcy Proceeding or termination, modification or waiver of the automatic stay pursuant to 11 U.S.C 362, except with the consent of Lender;
    iii. The conversion of the Bankruptcy Proceeding to a proceeding under Chapter 7 of the Bankruptcy Code;
    iv.  The payment of any claims that pre-date the filing of the petition for relief in the Bankruptcy Proceeding without the Lender's prior written consent; or
    v.   Any filing of a motion to amend, modify for reconsideration or notice of appeal of the Financing Order, or the entry of an order that alters or amends the Financing Order in any manner that is not acceptable to Lender, in Lender's sole discretion.

e.      Loss or destruction of or substantial damage to any material portion of the Collateral;

f.   Default which has not been cured during any applicable cure period in the prompt payment, performance or observance of any term, provision, condition, covenant, warranty or representation set forth in any mortgage, lien or encumbrance affecting the Collateral, whether or not such mortgage, lien or encumbrance is senior or junior to Lender's interest therein and whether or not such mortgage, lien or encumbrance has been consented to by Lender, provided, however, that nothing herein shall be deemed to be a consent by Lender, implied or otherwise, to the granting of any mortgage, lien or encumbrance on the Collateral;

g.   Such a change in the condition or affairs (financial or otherwise) of the Borrower or any Co-Obligor, or decline in the value of the Collateral as, in the opinion of the Lender, materially impairs the Lender's security or increases its risk or if the Lender in good faith deems itself insecure.

9.   **POWERS UPON DEFAULT:**  Upon the occurrence of any Default or at any time thereafter, Lender may, at its option, without notice or demand, do any one or more of the following, in addition to any other right or remedy that Lender may have at law or in equity or given to Lender under any of the Loan Documents, all of which are hereby authorized by Borrower:

a.   Declare the Obligations immediately due and payable;

b.   Cease advancing money or extending credit to or for the benefit of the Borrower under any agreement;

c.   Set-off against any and all deposits, accounts, certificate of deposit balances, claims, or other sums at any time credited by or due from the Lender to the Borrower and against all other property of Borrower in the possession of Lender or under its control;

d.   Realize immediately upon any Collateral, including exercise of any and all rights and remedies available to Lender under the Security  Documents and  under applicable law.

10.   **ATTORNEY IN FACT**:  Borrower hereby irrevocably constitutes Lender or any agent designated by Lender as Borrower's attorney-in-fact to execute, acknowledge, seal and deliver all instruments, agreements, deeds, certificates and other documents of every nature and description in order to carry out or implement the exercise of Lender's rights hereunder or under the other Loan Documents.

11.   **MISCELLANEOUS.**

a.   The Borrower agrees to pay ON DEMAND all expenses of Lender in connection with the administration, default or collection of the Obligations, including,

without limitation: (i) costs incurred with any examination of the Borrower's books and records, (ii) those expenses incurred or paid to protect, preserve, collect, lease, sell, repair, improve, advertise, locate, take possession of, liquidate or otherwise deal with any security for this Note, (iii) expenses of dealing with any person or entity in any bankruptcy proceeding, (iv) all out-of-pocket expenses incurred by the Lender for the Lender's attorney and paralegal fees, disbursements, and costs, all at such rates and with respect to such services as the Lender in its sole discretion may elect to pay (as such rates may vary from time to time during the course of the performance of such services) including the costs of attorneys who are employees of the Lender, and (v) the costs of appraisal, engineers, investment bankers, environmental consultants and other experts that may be retained by the Lender in connection with such collection efforts. Such costs will be added to the unpaid balance of the loan.

b.    No act, failure to act or delay by Lender in exercising any right, remedy, power or privilege under this Agreement or any other agreement contemplated hereby shall operate as a waiver of any provision hereof or thereof. No waiver on any one occasion shall be construed as a bar or waiver on any future occasion.

c.    The rights and remedies provided by this Agreement are cumulative and not exclusive of any other rights or remedies otherwise provided by agreement or law.

d.    Neither this Agreement nor any document contemplated hereby nor any provision of either can be amended, waived, discharged, terminated or modified except by writing signed by an authorized representative of Lender.

e.    This Agreement and the other documents, if any, contemplated by this Agreement constitute the entire final agreement between Lender and the Borrower and supersede any prior written or oral negotiations, understandings or agreements with respect to Lender's obligations to the Borrower.

f.    This Agreement shall bind the Borrower's heirs, assigns, successors and personal representatives, including, any trustee appointed in the Bankruptcy Proceeding whether under Chapter 11 or Chapter 7 and shall bind and inure to the benefit of Lender's successors and assigns.

g.    The Borrower hereby expressly waives presentment, demand for payment, notice of dishonor, protest and any and all other notices or demands in connection with the delivery, acceptance, performance, default or enforcement of this Agreement.

h.    This Agreement shall be governed by and interpreted and construed in accordance with the internal laws of the State of New Hampshire (without regard to conflict of law rules), and the Borrower hereby consents and submits to the jurisdiction of and placement of venue in the courts of the State of New Hampshire and of the United States of America located in New Hampshire in connection with any suit

or proceedings arising under this Agreement or any other agreement contemplated hereunder. The Borrower further agrees that service of process in any such suit or proceeding may be made by certified or registered mail, return receipt requested, directed to the Borrower at the most recent address for the Borrower on Lender's records, and service so made shall be complete five (5) days after the same shall have been so mailed.

i.    THE BORROWER HEREBY VOLUNTARILY WAIVES ANY AND ALL RIGHTS, WHETHER ARISING UNDER THE LAWS OR CONSTITUTION OF THE STATE OF NEW HAMPSHIRE OR THE UNITED STATES, RULES OF CIVIL PROCEDURE, COMMON LAW OR OTHERWISE, TO DEMAND A TRIAL BY JURY IN ANY ACTION, LAW SUIT, PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEDURE BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY LOAN DOCUMENT, OR THE DEALINGS OR RELATIONSHIP AMONG THE PARTIES. NO PARTY TO THIS AGREEMENT SHALL SEEK A JURY TRIAL IN ANY SUCH ACTION OR SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION OR PROCEEDING IN WHICH A JURY TRIAL HAS NOT BEEN OR CANNOT BE WAIVED. THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY DISCUSSED BY THE PARTIES AND SHALL BE SUBJECT TO NO EXCEPTIONS. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS PARAGRAPH WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

j.    If any part of this Agreement is held by a court to be unenforceable, no other part shall be affected, and the balance of this Agreement shall remain in full force and effect.

12.    **ADDITIONAL DISCLOSURES:** In addition to the disclosures contained in the foregoing text, Exhibit I sets forth an additional disclosure under New Hampshire RSA 399-B:2.

[signature page to follow]

IN WITNESS WHEREOF, intending to be legally bound, the Debtor has caused this Agreement to be duly executed as of the date first above written.

Dated:_____                           ISAACSON STRUCTURAL
                                                 STEEL, INC.


                                                 By:_____

Witness                                          Name:
                                                 Title:


Dated:_____                           CATE STREET CAPITAL, INC.


                                                 By:_____

Witness                                          Name:
                                                 Title:

# EXHIBIT A TO TERM LOAN AGREEMENT

## Note

# EXHIBIT B TO TERM LOAN AGREEMENT

## Security Agreement

# EXHIBIT C TO TERM LOAN AGREEMENT

## Intercreditor Agreement

# EXHIBIT D TO TERM LOAN AGREEMENT

## Disclosures

Disclosed Encumbrances (attached separate sheet if necessary):

Disclosed Litigation (attached separate sheet if necessary):

Disclosed Notices, Demands, Etc. Regarding Environmental Laws):

Disclosed Indebtedness (attached separate sheet if necessary):

Disclosed Guarantees (attached separate sheet if necessary):

Disclosed Leases:

# EXHIBIT E TO TERM LOAN AGREEMENT

## Encumbrances

# EXHIBIT F TO TERM LOAN AGREEMENT

## Indebtedness

# EXHIBIT G TO TERM LOAN AGREEMENT

## Guarantees

W:\Clients\ISSI\BANKRUPTCY\DRAFTS\00032283.DOC

# EXHIBIT H TO TERM LOAN AGREEMENT

## Leases

# EXHIBIT I TO TERM LOAN AGREEMENT

## Additional Disclosures

DISCLOSURE OF FINANCE CHARGES
Pursuant to New Hampshire RSA 399-B

Name and Address of Lender:

_____

_____

_____

Name and Address of Borrower:

_____

_____

_____

| | | |
|---|---|---|
| Amount of Loan: | | Credit Line $_____ <br> Term Loan $_____ |
| Payment Terms: | Credit Line: | Payable in monthly payments of accrued interest, plus the greater of 2% of principal or $200.00. |
| | Term Note: | \_\_\_\_\_ years from closing, in monthly payments of $_____. |

Finance Charges:

Rate of Interest:

| | | |
|---|---|---|
| | Credit Line: | Wall Street Journal Prime Rate plus \_\_\_\_%, adjusted daily. Current rate is \_\_\_\_\_%. |
| | Term Note: | [Fixed at \_\_\_\_\_%] <br> [Wall Street Journal Prime Rate + \_\_\_\_%, adjusted daily. Current rate is \_\_\_\_\_%] |

Commitment Fee:

| | |
|---|---|
| Credit Line: | $_____ |
| Term Note: | $_____ |

Late Charge:  If a payment is 10 days late, the greater of 5% of the late payment of $35.00

Prepaid Interest:

| | |
|---|---|
| Credit Line: | $_____ |
| Term Note: | $_____ |

26

Annual Fee $_____, on      Credit Line:             $_____
Overdraft Fee $_____ on      Credit Line:             $_____

Legal Fees and Expenses:        $_____           Paid by Borrower at closing.

Service Charges, Fees and Other    $_____(itemize)
Bank Charges:

      Borrowers acknowledge receipt of a copy of this Disclosure Statement at the Loan Closing.

WITNESS:                     Borrower Name: _____

_____      By: _____
                               Print Name:_____
                               Title:___

# EXHIBIT J TO TERM LOAN AGREEMENT

## Collateral Contracts

W:\Clients\ISSI\BANKRUPTCY\DRAFTS\00032283.DOC

# LIST OF PROJECTS SUBJECT TO CATE ST. CAPITAL LIEN

| Job No. | Job Name | General Contrctor |
|---------|----------|-------------------|
| 2-746 | Merrimack Clean Air | CCB, Inc |
| 2-750 | GT Solar Merrimack Addition | J.M. Couli |
| 2-742 | New Middletown School | Duchess County Ironworks |
| 2-744 | Paris Switchyard | GEEnergy |
| 2-754 | Oak Street | LMC Light Iron |
| 2-711A | PSNH Substatiion | PSNH |
| 2-753 | ZLD Building at Merrimack Station | Northeast Utlities |
| 2-737 | Liberty Mutual | Turner Construction |

# EXHIBIT K TO TERM LOAN AGREEMENT

## BFA Commitment

EXHIBIT

tabbies

_B_

$500,000                                    Date: June __, 2011

# COMMERCIAL PROMISSORY NOTE

**PROMISE TO PAY:** FOR VALUE RECEIVED, Isaacson Structural Steel, Inc., a New Hampshire corporation (the "Borrower") promises to pay to the order Cate Street Capital, Inc., a Delaware corporation (the "Lender") the principal amount of Five Hundred Thousand Dollars ($500,000) plus interest, costs and fees as described herein.

**DRAW FEATURE:** This Note possesses a draw feature. Upon satisfaction of the conditions set forth in this Note, Borrower shall be entitled to make one or more draws under this Note. No repayment of principal may be reborrowed or readvanced. The aggregate amount of such draws shall not exceed the full principal amount of this Note.

Information with regard to any loans or advances under this Note shall be recorded and maintained by Lender in its internal records and such records shall be conclusive as to the information set forth therein absent manifest error. Lender's failure to record the date and amount of any loan or advance shall not limit or otherwise affect the obligations of the Borrower under this Note to repay the principal amount of the loans or advances together with all interest accruing thereon. Lender shall not be obligated to provide Borrower with a copy of the record on a periodic basis. Borrower shall be entitled to inspect or obtain a copy of the record during Lender's business hours.

**VARIABLE INTEREST RATE:** This Note has a variable interest rate feature. The interest rate may change from time to time if the Index Rate identified below changes. So long as there is no default under this Note, interest shall be calculated at a variable rate equal to Two percent (2%) per annum plus the Index Rate. The initial Index Rate is ___ percent (__%) per annum. The initial interest rate is, therefore, _____ percent (_____ _____%) per annum. Any change in the interest rate resulting from a change in the Index Rate will be effective on the first day of the calendar month immediately following each change in the Index Rate. Interest shall be computed on the basis of actual days elapsed over a 360-day year.

**INDEX RATE:** The Index Rate for this Note shall be the Wall Street Journal Prime Rate. The "Wall Street Journal Prime Rate" is defined as the "Prime Rate" for domestic banks, as published in The Wall Street Journal, in the "Money Rates" section. If more than one such rate is published on any given day, the highest published rate shall be used to determine the Index Rate. If The Wall Street Journal ceases to publish a "Prime Rate," the Lender may choose a substitute source for the Prime Rate or may choose a substitute index. If the Lender chooses a substitute index, it may also choose a substitute margin so that the new index and margin result in an interest rate substantially similar to the Interest Rate in effect at the time the Prime Rate ceases to be published in The Wall Street Journal.

**DEFAULT RATE:** In the event of any default under this Note, all amounts owed to Lender shall bear interest at a rate equal to the interest rate otherwise applicable to this loan identified above plus four percent (4%) per annum.

**PAYMENT SCHEDULE:** Borrower shall pay the principal and interest according to the following schedule:

Interest only payable monthly, beginning on the first day of the calendar month immediately following the date of this Note.

Notwithstanding any other term or provision contained in this Note, the principal balance of this Note, together with all accrued and unpaid interest and all fees and charges payable to the Lender hereunder shall be due in full on September 30, 2011 (the "Maturity Date").

All payments will be made to Lender at the address designated by Lender in lawful currency of the United States of America.

**PREPAYMENT:** This Note may be prepaid in part or in full on or before the Maturity Date. Any partial prepayment will not affect the due date or the amount of any subsequent installment, unless agreed to, in writing, by Borrower and Lender. No repayment of principal may be reborrowed or readvanced to the Borrower.

**LATE FEE:** If any payment of principal or interest due hereunder is not paid within fifteen (15) days of the due date, Lender may require Borrower to pay a late fee equal to five percent (5%) of the overdue amount, in addition to and not in lieu of further accrual of interest on any overdue amount.

**SECURITY:** This Note is secured by (a) a pledge of, and a security interest in, the Collateral Contracts identified in the Loan Agreement and all of the Borrower's accounts receivable, inventory, raw materials and work in process related to, or associated with, the Collateral Contracts; and (b) a first priority security interest in, and a right to repayment from, the proceeds of a loan in the amount of approximately $2,250,000 to be made to Borrower pursuant to the BFA Financing Commitment described in the Loan Agreement.

This Note, Security Agreement, the Intercreditor Agreement, the Loan agreement, and every other document executed in connection therewith, and all amendments, extensions, modifications, renewals, replacements or substitutions thereto, are referred to in this Note as the "Loan Documents." Borrower's obligations under the Loan Documents are referred to in this Note as the "Obligations."

**LOAN AGREEMENT:** This Note is subject to the terms and entitled to the benefits of the Loan agreement. In the event there is any inconsistency between the provisions of this Note and the provisions of the Loan Agreement, the provisions of this Note shall govern.

**EVENTS OF DEFAULT:** The following shall be events of default under this Note (each referred to herein as a "Default"):

(1)     Failure by Borrower, or by any co-obligor, endorser, guarantor or surety for or under any of the Obligations (each referred to herein as a "Co-Obligor"), to make full and prompt payment when due, of any amount required to be paid to Lender under this Note or any of the Loan Documents or any other agreement;

(2)     Failure by Borrower or any Co-Obligor to perform, keep or observe any term, provision, condition, covenant, agreement, warranty or representation contained in any of the Loan Documents or any other agreement with or in favor of Lender, which failure continues for ten (10) days after notice thereof by Lender to the person or entity required to perform, keep or observe such term, provision, condition, covenant, agreement, warranty or representation; or

(3)     Any other Default or Event of Default under the Loan Agreements or any other agreements contemplated thereby.

Upon the occurrence of a Default, Lender shall have the right to exercise all legal remedies available to it at law, including all remedies set forth in the Loan Agreement, and the Security Agreements.

**COLLECTION EXPENSES:**  The Borrower agrees to pay all actual costs of collection and attempted collection, including, without limitation: (1) those expenses incurred or paid to protect, preserve, collect, lease, sell, repair, improve, advertise, locate, take possession of, liquidate or otherwise deal with any Collateral, (2) expenses of dealing with any person or entity in any bankruptcy proceeding, (3) all out-of-pocket expenses incurred by the Lender for the Lender's attorney and paralegal fees, disbursements, and costs, all at such rates and with respect to such services as the Lender in its sole discretion may elect to pay (as such rates may vary from time to time during the course of the performance of such services) including the costs of attorneys who are employees of the Lender, and (4) the costs of appraisers, engineers, investment bankers, environmental consultants and other experts that may be retained by the Lender in connection with such collection efforts.  Such costs will be added to the unpaid balance of the loan.

**WAIVER OF RIGHTS:**  The Borrower waives the rights of demand, protest, notice of acceptance of this Note, notice of default or dishonor, presentment, notice of loans made, credit extended, collateral received or delivered or other action taken by the Lender hereunder and all other demands and notices of any description. The Borrower further waives any right of offset, recoupment or counterclaim to reduce the Borrower's obligations under this Note.

**LENDER'S RIGHTS:**  The Lender shall not be deemed to have waived any of its rights under this Note or otherwise unless such waiver is in writing and signed by the Lender.  Lender's failure to require strict performance of the terms, covenants and agreements of this Note or any other of the Loan Documents, or any delay or omission on the part of the Lender in exercising any right, or any acceptance of partial or adequate payment or performance shall not waive, affect or diminish such right or Borrower's duty of compliance and performance therewith.  A waiver on any one occasion shall not be construed as a bar to or waiver of the same or any other right on the same or any future occasion.  All rights and remedies of the Lender under this Note or any other of the Loan Documents, shall be cumulative and may be exercised singularly or

concurrently. This Note may be negotiated, extended or renewed by the Lender without releasing the Borrower or any Co-Obligor.

**SURVIVAL OF REPRESENTATIONS:** All representations and warranties of Borrower, and all terms, provisions, conditions and agreements to be performed by Borrower contained herein shall be true and satisfied at the time of the execution of this Note, and shall survive the closing hereof and the execution and delivery of this Note.

**GOVERNING LAW; SEVERABILITY:** This Note shall be construed in all respects in accordance with, and governed by, the internal laws of the State of New Hampshire. Wherever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provisions of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

**MODIFICATION:** This Note may not be altered or amended except by an agreement in writing signed by both Lender and Borrower, and consented to in writing by Passumpsic Savings Bank, but in no event shall any repaid principal amount be readvanced, the principal amount increased, or the maturity date extended beyond September 30, 2011.

**APPLICATION OF PAYMENT:** Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received by Lender from Borrower, or from any other source, and Borrower does hereby irrevocably agree that Lender shall have the continuing exclusive right to apply and reapply any and all payments received at any time or times hereafter against the Obligations in such manner as Lender may deem advisable.

**SECTION TITLES:** The section titles contained in this Note are for convenience only and shall not affect the construction or meaning of this Note.

**NOTICES:** All notices and other communications required or permitted under this Note shall be in writing and shall be personally delivered or given by registered or certified mail. Any such notice shall be deemed effective on the earlier of (a) the time when such notice is actually received or (b) the third day following its deposit in the United States mail, postage prepaid and addressed as follows:

If intended for Borrower, to:

Isaacson Structural Steel, Inc.

_____

_____

_____

If intended for Lender, to:

Cate Street Capital, Inc.
One Cate Street
Portsmouth, NH 03801
Attn: President

Any party may change the address to which its future notices shall be sent by notice given as provided above, to be effective upon receipt.

**ASSIGNMENT; SUCCESSORS AND ASSIGNS:** Borrower shall not be entitled to assign any of its rights or obligations under this Note without Lender's prior written consent. Lender shall be entitled to assign some or all of its rights under this Note without notice to or consent of Borrower. This Note shall be binding upon and inure to the benefit of Borrower, Lender and their respective successors, assigns, trustees, receivers, administrators, personal representatives, legatees and devisees.

**WAIVER OF JURY TRIAL:** LENDER AND BORROWER EXPRESSLY AND VOLUNTARILY WAIVE ANY AND ALL RIGHTS, WHETHER ARISING UNDER THE UNITED STATES OR ANY STATE CONSTITUTION, ANY RULES OF CIVIL PROCEDURE, COMMON LAW OR OTHERWISE, TO DEMAND A TRIAL BY JURY IN ANY ACTION, LAWSUIT, PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEDURE BASED UPON, OR ARISING OUT OF, THIS NOTE OR THE LOAN DOCUMENTS, ANY AGREEMENTS ARISING UNDER OR RELATING TO THIS NOTE, ANY COLLATERAL SECURING THE OBLIGATIONS, OR THE DEALINGS OR RELATIONSHIPS BETWEEN OR AMONG LENDER AND BORROWER, OR ANY OF THEM. NEITHER LENDER NOR BORROWER, INCLUDING ANY ASSIGNEE OR SUCCESSOR OF LENDER OR BORROWER, SHALL SEEK A JURY TRIAL IN ANY SUCH ACTION. NEITHER LENDER NOR BORROWER SHALL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION WHEN A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NEITHER LENDER NOR BORROWER HAS IN ANY WAY AGREED WITH OR REPRESENTED TO THE OTHER THAT THE PROVISIONS OF THIS PARAGRAPH WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

ISAACSON STRUCTURAL STEEL, INC.

By:_____

Name:

Title:

_____
Witness

EXHIBIT

_C_

# SECURITY AGREEMENT

This **SECURITY AGREEMENT**, dated as of June __, 2011, between Isaacson Structural Steel, Inc., a New Hampshire corporation (the "Debtor"), and Cate Street Capital, Inc., a Delaware corporation (the "Secured Party").

WHEREAS, the Debtor has entered into a Loan Agreement, dated as of June __, 2011(as amended and in effect from time to time, the "Loan Agreement"), with the Secured Party, pursuant to which the Secured Party, subject to the terms and conditions contained therein, is to make loans to the Debtor pursuant to the Commercial Promissory Note ( the "Note"); and

WHEREAS, it is a condition precedent to the Secured Party's making any loans to the Debtor under the Loan Agreement that the Debtor execute and deliver to the Secured Party a security agreement in substantially the form hereof; and

WHEREAS, the Debtor wishes to grant a security interest in favor of the Secured Party as herein provided;

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Definitions. All capitalized terms used herein without definitions shall have the respective meanings provided therefor in the Loan Agreement. The term "State," as used herein, means the State of New Hampshire. All terms defined in the Uniform Commercial Code of the State and used herein shall have the same definitions herein as specified therein. However, if a term is defined in Article 9 of the Uniform Commercial Code of the State differently than in another Article of the Uniform Commercial Code of the State, the term has the meaning specified in Article 9.  The term "Obligations," as used herein, means all of the indebtedness, obligations and liabilities of the Debtor to the Secured Party, individually or collectively, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereafter arising under or in respect of the or this Agreement, and the term "Event of Default," as used herein, means the failure of the Debtor to pay or perform any of the Obligations as and when due to be paid or performed under the terms of the Loan Agreement. Also, if not defined in the Loan Agreement or another document to which reference for defined terms is made, define "Default," "Event of Default," "Loan Documents" and "Security Documents" here.

2.    Grant of Security Interest. The Debtor hereby grants to the Secured Party, to secure the payment and performance in full of all of the Obligations, a security interest in and so pledges and assigns to the Secured Party (i) a pledge of, and a first priority security interest in, the Collateral Contracts and all of the Borrower's accounts receivable, inventory, raw materials and work in process related to, or associated with, the Collateral Contracts; and (ii) a first priority security interest in, and a right to

repayment from, the proceeds of a loan in the amount of approximately $2,250,000 to be made to Borrower pursuant to the BFA Financing Commitment; and (iii) a first priority security interest in all proceeds of the loan made pursuant to the Loan Agreement; (iv) all Property described in any Security Documents as security for any Obligations, and all other Property that now or hereafter secures (or is intended to secure) any Obligations; whether now owned or hereafter acquired or arising, and all proceeds and products of the property listed in clauses (i) through (iv) above (all of the same being hereinafter called the "Collateral").

3.      Authorization to File Financing Statements. The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) identify the Collateral in a manner consistent with Section 2 hereof, and (b) provide any other information required by part 5 of Article 9 of the Uniform Commercial Code of the State, or such other jurisdiction, for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Debtor is an organization, the type of organization and any organizational identification number issued to the Debtor. The Debtor agrees to furnish any such information to the Secured Party promptly upon the Secured Party's request.

4.      Other Actions. To further the attachment, perfection and first priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in the Collateral, and without limitation on the Debtor's other obligations in this Agreement, the Debtor agrees, in each case at the Debtor's expense, to take the following actions with respect to the following Collateral:

        4.1.    Collateral in the Possession of a Bailee. If any Collateral is at any time in the possession of a bailee, the Debtor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgement from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party, and that such bailee agrees to comply, without further consent of the Secured Party, with instructions from the Secured Party as to such Collateral. The Secured Party agrees with the Debtor that the Secured Party shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the Debtor with respect to the bailee.

        4.2.    Other Actions as to Any and All Collateral. The Debtor further agrees, at the request and option of the Secured Party, to take any and all other actions the Secured Party may determine to be necessary or useful for the attachment, perfection and first priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in any and all of the Collateral, including, without limitation, (a) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code, to the extent, if any, that the Debtor's signature thereon is required therefor, (b) causing the Secured Party's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to

attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (c) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (d) obtaining governmental and other third party waivers, consents and approvals in form and substance satisfactory to Secured Party, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, and (e) taking all actions under any earlier versions of the Uniform Commercial Code or under any other law, as reasonably determined by the Secured Party to be applicable in any relevant Uniform Commercial Code or other jurisdiction, including any foreign jurisdiction.

5.    Representations and Warranties Concerning Debtor's Legal Status. The Debtor has previously delivered to the Secured Party a certificate signed by the Debtor and entitled "Perfection Certificate" attached hereto as Schedule C (the "Perfection Certificate"). The Debtor represents and warrants to the Secured Party as follows: (a) the Debtor's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof, (b) the Debtor is an organization of the type, and is organized in the jurisdiction set forth in the Perfection Certificate, (c) the Perfection Certificate accurately sets forth the Debtor's organizational identification number or accurately states that the Debtor has none, (d) the Perfection Certificate accurately sets forth the Debtor's place of business or, if more than one, its chief executive office, as well as the Debtor's mailing address, if different, (e) all other information set forth on the Perfection Certificate pertaining to the Debtor is accurate and complete, and (f) that there has been no change in any information provided in the Perfection Certificate since the date on which it was executed by the Debtor.

6.    Covenants Concerning Debtor's Legal Status. The Debtor covenants with the Secured Party as follows: (a) without providing at least 30 days prior written notice to the Secured Party, the Debtor will not change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, (b) if the Debtor does not have an organizational identification number and later obtains one, the Debtor shall forthwith notify the Secured Party of such organizational identification number, and (c) the Debtor will not change its type of organization, jurisdiction of organization or other legal structure.

7.    Representations and Warranties Concerning Collateral, etc. The Debtor further represents and warrants to the Secured Party as follows: (a) the Debtor is the owner of the Collateral, free from any right or claim of any person or any adverse lien, security interest or other encumbrance, except for the security interest created by this Agreement and other liens permitted by the Loan Agreement, (b) none of the Collateral constitutes, or is the proceeds of, "farm products" as defined in Section 9-102(a)(34) of the Uniform Commercial Code of the State, (c) none of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral, and (d) the Debtor has at all times operated its business in compliance with all applicable

provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances, (e) all other information set forth on the Perfection Certificate pertaining to the Collateral is accurate and complete, and (g) that there has been no change in any information provided in the Perfection Certificate since the date on which it was executed by the Debtor.

8.     <u>Covenants Concerning Collateral, etc</u>. The Debtor further covenants with the Secured Party as follows: (a) the Collateral, to the extent not delivered to the Secured Party pursuant to Section 4, will be kept at those locations listed on the Perfection Certificate and the Debtor will not remove the Collateral from such locations, without providing at least thirty days prior written notice to the Secured Party, (b) except for the security interest herein granted and liens permitted by the Loan Agreement, the Debtor shall be the owner of the Collateral free from any right or claim of any other person, lien, security interest or other encumbrance, and the Debtor shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to the Secured Party, (c) the Debtor shall not pledge, mortgage or create, or suffer to exist any right of any person in or claim by any person to the Collateral, or any security interest, lien or encumbrance in the Collateral in favor of any person, other than the Secured Party except for liens permitted by the Loan Agreement, (d) the Debtor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon, (e) as provided in the Loan Agreement, the Debtor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located, (f) the Debtor will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement, (g) the Debtor will continue to operate, its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances, and (h) the Debtor will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except for sales of inventory in the ordinary course of business.

9.     <u>Insurance</u>.

9.1.     <u>Maintenance of Insurance</u>. The Debtor will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. Such insurance shall be in such minimum amounts that the Debtor will not be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Secured Party. In addition, all such insurance shall be payable to the Secured Party as loss payee. Without limiting the foregoing, the Debtor will (i) keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverages and

electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property, (ii) maintain all such workers' compensation or similar insurance as may be required by law, and (iii) maintain, in amounts equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death or property damage occurring, on, in or about the properties of the Debtor; business interruption insurance; and product liability insurance.

     9.2.   <u>Insurance Proceeds</u>. The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with an interest having priority in the property covered thereby, (i) so long as no Default or Event of Default has occurred and is continuing and to the extent that the amount of such proceeds is less than $50,000, be disbursed to the Debtor for direct application by the Debtor solely to the repair or replacement of the Debtor's property so damaged or destroyed, and (ii) in all other circumstances, be held by the Secured Party as cash collateral for the Obligations. The Secured Party may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as the Secured Party may reasonably prescribe, for direct application by the Debtor solely to the repair or replacement of the Debtor's property so damaged or destroyed, or the Secured Party may apply all or any part of such proceeds to the Obligations with the Commitment (if not then terminated) being reduced by the amount so applied to the Obligations.

     9.3.   <u>Continuation of Insurance</u>. All policies of insurance shall provide for at least 10 days prior written cancellation notice to the Secured Party. In the event of failure by the Debtor to provide and maintain insurance as herein provided, the Secured Party may, at its option, provide such insurance and charge the amount thereof to the Debtor. The Debtor shall furnish the Secured Party with certificates of insurance and policies evidencing compliance with the foregoing insurance provision.

10.    <u>Collateral Protection Expenses; Preservation of Collateral</u>.

     10.1.   <u>Expenses Incurred by Secured Party</u>. In the Secured Party's discretion, if the Debtor fails to do so, the Secured Party may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, maintain any of the Collateral, make repairs thereto and pay any necessary filing fees or insurance premiums. The Debtor agrees to reimburse the Secured Party on demand for all expenditures so made. The Secured Party shall have no obligation to the Debtor to make any such expenditures, nor shall the making thereof be construed as the waiver or cure of any Default or Event of Default.

     10.2.   <u>Secured Party's Obligations and Duties</u>. Anything herein to the contrary notwithstanding, the Debtor shall remain obligated and liable under each contract or agreement comprised in the Collateral to be observed or performed by the Debtor thereunder. The Secured Party shall not have any obligation or liability under any such

contract or agreement by reason of or arising out of this Agreement or the receipt by the Secured Party of any payment relating to any of the Collateral, nor shall the Secured Party be obligated in any manner to perform any of the obligations of the Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Secured Party or to which the Secured Party may be entitled at any time or times. The Secured Party's sole duty with respect to the custody, safe keeping and physical preservation of the Collateral in its possession, under Section 9-207 of the Uniform Commercial Code of the State or otherwise, shall be to deal with such Collateral in the same manner as the Secured Party deals with similar property for its own account.

11.     Notification to Account Debtors and Other Persons Obligated on Collateral. If a Default or an Event of Default shall have occurred and be continuing, the Debtor shall, at the request and option of the Secured Party, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral, to the extent covered by this Agreement, and that payment thereof is to be made directly to the Secured Party or to any financial institution designated by the Secured Party as the Secured Party's agent therefor, and the Secured Party may itself, if a Default or an Event of Default shall have occurred and be continuing, without notice to or demand upon the Debtor, so notify account debtors and other persons obligated on Collateral. After the making of such a request or the giving of any such notification, the Debtor shall hold any proceeds of collection of any such accounts, chattel paper, general intangibles, instruments and other Collateral received by the Debtor as trustee for the Secured Party without commingling the same with other funds of the Debtor and shall turn the same over to the Secured Party in the identical form received, together with any necessary endorsements or assignments. The Secured Party shall apply the proceeds of collection of all such accounts, chattel paper, general intangibles, instruments and other Collateral received by the Secured Party to the Obligations, such proceeds to be immediately credited after final payment in cash or other immediately available funds of the items giving rise to them.

12.     Power of Attorney.

12.1.     Appointment and Powers of Secured Party. The Debtor hereby irrevocably constitutes and appoints the Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of the Debtor or in the Secured Party's own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or useful to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of the Debtor, without notice to or assent by the Debtor, to do the following:

(a)     upon the occurrence and during the continuance of a Default or an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise dispose of or deal with any of the Collateral in such manner as is consistent with the Uniform Commercial Code of the State and as fully and completely as though the Secured Party were the absolute owner thereof for all purposes, and to do, at the Debtor's expense, at any time, or from time to time, all acts and things which the Secured Party deems necessary or useful to protect, preserve or realize upon the Collateral and the Secured Party's security interest therein, in order to effect the intent of this Agreement, all at least as fully and effectively as the Debtor might do, including, without limitation, (i) the filing and prosecuting of registration and transfer applications with the appropriate federal, state, local or other agencies or authorities with respect to trademarks, copyrights and patentable inventions and processes, (ii) upon written notice to the Debtor, the exercise of voting rights with respect to voting securities, which rights may be exercised, if the Secured Party so elects, with a view to causing the liquidation of assets of the issuer of any such securities, and (iii) the execution, delivery and recording, in connection with any sale or other disposition of any Collateral, of the endorsements, assignments or other instruments of conveyance or transfer with respect to such Collateral; and

(b)     to the extent that the Debtor's authorization given in Section 3 is not sufficient, to file such financing statements with respect hereto, with or without the Debtor's signature, or a photocopy of this Agreement in substitution for a financing statement, as the Secured Party may deem appropriate and to execute in the Debtor's name such financing statements and amendments thereto and continuation statements which may require the Debtor's signature.

12.2.   Ratification by Debtor. To the extent permitted by law, the Debtor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and is irrevocable.

12.3.   No Duty on Secured Party. The powers conferred on the Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. The Secured Party shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Debtor for any act or failure to act, except for the Secured Party's own gross negligence or willful misconduct.

13.     Rights and Remedies. If an Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Debtor have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code of the State and any additional rights and remedies which may be provided to a secured party in any jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose the Secured Party may, so far as the Debtor can give authority therefor, enter upon any

7

premises on which the Collateral may be situated and remove the same therefrom. The Secured Party may in its discretion require the Debtor to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of the Debtor's principal office(s) or at such other locations as the Secured Party may reasonably designate. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Secured Party shall give to the Debtor at least five Business Days prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. The Debtor hereby acknowledges that five Business Days prior written notice of such sale or sales shall be reasonable notice. In addition, the Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Secured Party's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

14.     Standards for Exercising Rights and Remedies. To the extent that applicable law imposes duties on the Secured Party to exercise remedies in a commercially reasonable manner, the Debtor acknowledges and agrees that it is not commercially unreasonable for the Secured Party (a) to fail to incur expenses reasonably deemed significant by the Secured Party to prepare Collateral for disposition or otherwise to fail to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to fail to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as the Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure the Secured Party against risks of loss, collection or disposition of Collateral or to provide to the Secured Party a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Secured Party in the collection or disposition of any of the Collateral. The Debtor acknowledges that the purpose of this Section 16 is to provide non-exhaustive indications of what actions or omissions by the Secured Party would fulfill the Secured Party's duties under the Uniform Commercial Code or other law of the State or any other relevant jurisdiction in

the Secured Party's exercise of remedies against the Collateral and that other actions or omissions by the Secured Party shall not be deemed to fail to fulfill such duties solely on account of not being indicated in this Section 15. Without limitation upon the foregoing, nothing contained in this Section 15 shall be construed to grant any rights to the Debtor or to impose any duties on the Secured Party that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 16.

15.    No Waiver by Secured Party, etc. The Secured Party shall not be deemed to have waived any of its rights or remedies in respect of the Obligations or the Collateral unless such waiver shall be in writing and signed by the Secured Party. No delay or omission on the part of the Secured Party in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All rights and remedies of the Secured Party with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as the Secured Party deems expedient.

16.    Suretyship Waivers by Debtor. The Debtor waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. With respect to both the Obligations and the Collateral, the Debtor assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as the Secured Party may deem advisable. The Secured Party shall have no duty as to the collection or protection of the Collateral or any income therefrom, the preservation of rights against prior parties, or the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in Section 10.2. The Debtor further waives any and all other suretyship defenses.

17.    Marshalling. The Secured Party shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, the Debtor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Secured Party's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Debtor hereby irrevocably waives the benefits of all such laws.

18.     Proceeds of Dispositions; Expenses. The Debtor shall pay to the Secured Party on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Secured Party in protecting, preserving or enforcing the Secured Party's rights and remedies under or in respect of any of the Obligations or any of the Collateral. After deducting all of said expenses, the residue of any proceeds of collection or sale or other disposition of the Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as the Secured Party may determine, proper allowance and provision being made for any Obligations not then due. Upon the final payment and satisfaction in full of all of the Obligations and after making any payments required by Sections 9-608(a)(1)(C) or 9-615(a)(3) of the Uniform Commercial Code of the State, any excess shall be returned to the Debtor. In the absence of final payment and satisfaction in full of all of the Obligations, the Debtor shall remain liable for any deficiency.

19.     Overdue Amounts. Until paid, all amounts due and payable by the Debtor hereunder shall be a debt secured by the Collateral and shall bear, whether before or after judgment, interest at the rate of interest for overdue principal set forth in the Loan Agreement.

20.     Governing Law; Consent to Jurisdiction. THIS AGREEMENT IS INTENDED TO TAKE EFFECT AS A SEALED INSTRUMENT AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW HAMPSHIRE.  The Debtor agrees that any action or claim arising out of, or any dispute in connection with, this Agreement, any rights, remedies, obligations, or duties hereunder, or the performance or enforcement hereof or thereof, may be brought in the courts of the State or any federal court sitting therein and consents to the non-exclusive jurisdiction of such court and to service of process in any such suit being made upon the Debtor by mail at the address specified in the Note. The Debtor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

21.     Waiver of Jury Trial. THE DEBTOR WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS, REMEDIES, OBLIGATIONS, OR DUTIES HEREUNDER, OR THE PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF. Except as prohibited by law, the Debtor waives any right which it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages. The Debtor (i) certifies that neither the Secured Party nor any representative, agent or attorney of the Secured Party has represented, expressly or otherwise, that the Secured Party would not, in the event of litigation, seek to enforce the foregoing waivers or other waivers contained in this Agreement, and (ii) acknowledges that, in entering into the Loan Agreement, the Secured Party is relying upon, among other things, the waivers and certifications contained in this Section 21.

22.     Miscellaneous. The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof. This Agreement and all rights and obligations hereunder shall be binding upon the Debtor and its respective successors and assigns, and shall inure to the benefit of the Secured Party and its successors and assigns. If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be enforceable as if such invalid, illegal or unenforceable term had not been included herein. The Debtor acknowledges receipt of a copy of this Agreement.

[signature page to follow]

IN WITNESS WHEREOF, intending to be legally bound, the Debtor has caused this Agreement to be duly executed as of the date first above written.

Dated:_____                ISAACSON STRUCTURAL
                                      STEEL, INC.


                                      By:_____

Witness                               Name:
                                      Title:


Dated:_____                CATE STREET CAPITAL,
                                      INC.


                                      By:_____

Witness                               Name:
                                      Title:


CERTIFICATE OF ACKNOWLEDGMENT
STATE OF NEW HAMPSHIRE)
                                      ) ss.
COUNTY OF *_____                      )

Before me, the undersigned, a Notary Public in and for the county aforesaid, on this ____ day of ____, 2011, personally appeared ____ to me known personally, and who, being by me duly sworn, deposes and says that [s]he is the ____ of ____, and that said instrument was signed and sealed on behalf of said [type of organization] by authority of its Board of Directors, and said ____ acknowledged said instrument to be the free act and deed of said [type of organization].

Notary Public
My commission expires:

PERFECTION CERTIFICATE
(UCC Financing Statements)

The undersigned, the ____ and ____ of Isaacson Structural Steel, Inc., a New Hampshire corporation (the "Debtor"), hereby certifies, with reference to a certain ____ dated as of ____ (terms defined in such Security Agreement having the same meanings herein as specified therein), between the Debtor and Cate Street Capital, Inc., a Delaware corporation (the "Secured Party"), to the Secured Party as follows:

1.    Name. The exact legal name of the Debtor as that name appears on its [Certificate of Incorporation] is as follows:

2.    Other Identifying Factors.
      (a)    The following is a mailing address for the Debtor:
      (b)    If different from its indicated mailing address, the Debtor's place of business or, if more than one, its chief executive office is located at the following address:

        Address        County        State



      (c)    The following is the type of organization of the Debtor:
      (d)    The following is the jurisdiction of the Debtor's organization:
      (e)    The following is the Debtor's state issued organizational identification number [state "None" if the state does not issue such a number]:

3.    Other Names, etc.
      (a)    The following is a list of all other names (including trade names or similar appellations) used by the Debtor, or any other business or organization to which the Debtor became the successor by merger, consolidation, acquisition, change in form, nature or jurisdiction of organization or otherwise, now or at any time during the past five years:
      (b)    Attached hereto as Schedule 3 is the information required in Section 2 for any other business or organization to which the Debtor became the successor by merger, consolidation, acquisition of assets, change in form, nature or jurisdiction of organization or otherwise, now or at any time during the past five years:

4.    Other Current Locations.
      (a)    The following are all other locations in the United States of America in which the Debtor maintains any books or records relating to any of the Collateral consisting of accounts, instruments, chattel paper, general intangibles or mobile goods:

        Address        County        State

(b)     The following are all other places of business of the Debtor in the United States of America:

Address                 County          State


(c)     The following are all other locations in the United States of America where any of the Collateral consisting of inventory or equipment is located:

Address                 County          State


(d)     The following are the names and addresses of all persons or entities other than the Debtor, such as lessees, consignees, warehousemen or purchasers of chattel paper, which have possession or are intended to have possession of any of the Collateral consisting of instruments, chattel paper, inventory or equipment:

Name            Mailing Address                 County          State


5.      Prior Locations.
        (a)     Set forth below is the information required by Section 4 (a) or (b) with respect to each location or place of business previously maintained by the Debtor at any time during the past five years in a state in which the Debtor has previously maintained a location or place of business at any time during the past four months:

Address                 County          State


(b)     Set forth below is the information required by Section 4(c) or (d) with respect to each other location at which, or other person or entity with which, any of the Collateral consisting of inventory or equipment has been previously held at any time during the past twelve months:

Name            Mailing Address                 County          State


6.      Intentionally Omitted.

7.      Unusual Transactions. Except for those purchases, acquisitions and other transactions described on Schedule 3 or on Schedule 7 attached hereto, all of the Collateral has been originated by the Debtor in the ordinary course of the Debtor's business or consists of goods which have been acquired by the Debtor in the ordinary course from a person in the business of selling goods of that kind.

8.     File Search Reports. Attached hereto as Schedule 8(A) is a true copy of a file search report from the Uniform Commercial Code filing officer (or, if such officer does not issue such reports, from an experienced Uniform Commercial Code search organization acceptable to the Secured Party) (i) in each jurisdiction identified in Section 2(d) or in Section 4 or 5 with respect to each name set forth in Section 1 or 3 ; and (ii) in each jurisdiction in which any of the transactions described in Schedule 3 or 7 took place with respect to the legal name of the person from which the Debtor purchased or otherwise acquired any of the Collateral. Attached hereto as Schedule 8(B) is a true copy of each financing statement or other filing identified in such file search reports.

9.     UCC Filings. A duly authorized financing statement, in a form acceptable to the Secured Party and containing the indication of the Collateral set forth on Schedule 9(A) has been duly filed in the central Uniform Commercial Code filing office in the jurisdiction identified in Section 2(d). Attached hereto as Schedule 9(B) is a true copy of each such filing duly acknowledged or otherwise identified by the filing office.

10.     Termination Statements. A duly signed or otherwise authorized termination statement in form acceptable to the Secured Party has been duly filed in each applicable jurisdiction identified in Section 2(d), 3, 4 and 5 or on Schedule 3 or 7 hereto [or, in the case of Schedule 3 or 7, a release acceptable to the Secured Party from the secured party of the person from which the Debtor purchased or otherwise acquired the Collateral identified on Schedule 3 or 7], has been delivered to the Secured Party. Attached hereto as Schedule 10 is a true copy of each such filing duly acknowledged or otherwise identified by the filing office [and of each such release].

11.     Schedule of Filing. Attached hereto as Schedule 11 is a schedule setting forth filing information with respect to the filings described in Sections 9 and 10.

12.     Filing Fees. All filing fees and taxes payable in connection with the filings described in Sections 9 and 10 have been paid.

IN WITNESS WHEREOF, we have hereunto signed this Certificate on _____, 2011.

Title:

Title:


# INTERCREDITOR AGREEMENT

**THIS AGREEMENT** made as of this ___ day of June, 2011, by and among the following parties, who are collectively referred to herein as the "Lenders" and each as a "Lender" as consented and agreed to by the Borrower (as defined below):

1.    Passumpsic Savings Bank, a Vermont banking corporation (the "Existing Lender"); and

2.    Cate Street Capital, Inc., a Delaware corporation (the "New Money Lender").

## RECITALS

To explain the circumstances giving rise to this Intercreditor Agreement (the "Agreement") and to define some of the terms employed in the terms of agreement below, the parties recite the following:

1.    The New Money Lenders have extended, or are now extending, credit to Isaacson Structural Steel, Inc., (the "Borrower"), the debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code in a case docketed as In re Isaacson Structural Steel, Inc., Docket No. 11-12416 (the "Chapter 11 case") pending in the United States Bankruptcy Court for the District of New Hampshire ("the Court") pursuant to a Loan Agreement and a Commercial Promissory Note (the "New Note"), each of near or even date herewith in the aggregate original principal amount of up to Five Hundred Thousand Dollars ($500,000) (the "New Loan"). Pursuant to the Security Agreement between the New Money Lender and the Borrower dated as of even date herewith (the "Security Agreement"), the New Loan is to be secured by a security interest in, pledge and assignment of (i) the contracts and agreements between Borrower and third parties identified in Schedule A hereto ("Collateral Contracts"), and all of the Borrower's accounts receivable, inventory, raw materials and work in process related to, or associated with, the Collateral Contracts; and (ii) a first priority security interest in, and a right to repayment from, the proceeds of a loan in the amount of approximately $2,250,000 to be made to Borrower pursuant to the commitment letter from the New Hampshire Business Finance Authority to the Borrower dated June 24, 2011 attached hereto as Schedule B ("BFA Financing Commitment") wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the "New Money Liens").

2.    The Existing Lender previously extended credit to Borrower pursuant to loans made to the Borrower on or about _____ (the "Existing Loans"). The Existing Loans are secured by a security interest in, mortgage of, assignment of and/or pledge of, all Borrower's assets pursuant to certain security agreement between the Existing Lenders and the Borrower (the "Existing Liens").

3.    New Money Lender has agreed that the first Twenty-Five Thousand Dollars ($25,000) of the funds to be loaned to Borrower in connection with the New Money Loan, as defined herein, shall be immediately set aside, dedicated and paid to the Gallagher, Flynn &

Company, LLP ("GF"), said sum to be retained by GF and used to pay the anticipated accounting and audit work for borrower and borrower's affiliate, Isaacson Steel, Inc. The Lenders have agreed that the $25,000 payment to be made to GF is a material term of this Intercreditor Agreement and is a condition precedent to any lien subordination contemplated herein.

4.     The Lenders have agreed that their respective priorities and rights in the collateral given by the Borrower with respect to the New Loan and the Existing Loan shall be governed by this Agreement.

## TERMS OF AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Definitions</u>.

a. "New Money Lender Collateral" means a security interest in, pledge and assignment of

(i) the contracts and agreements between Borrower and third parties identified in Schedule A hereto ("Collateral Contracts"), and all of the Borrower's accounts receivable, inventory, raw materials and work in process related to, or associated with, the Collateral Contracts; and

(ii) a first priority security interest in, and a right to repayment from, the proceeds of a loan in the amount of approximately $2,250,000 to be made to Borrower pursuant to the commitment letter from the New Hampshire Business Finance Authority to the Borrower dated June 24, 2011 attached hereto as Schedule B ("BFA Financing Commitment"); and

(iii) a first priority security interest in all proceeds of the New Loan; and

(iv) all property described in any security documents as security for any obligations owed to New Money Lender and all property that now or hereafter secures (or is intended to secure) any such obligations;

wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.

b. "Existing Lender Collateral" means all of the Borrower's assets as described in the Recitals to this Agreement.

2

c. "Collateral" means any and all property in which any one or more of the parties to this Agreement have been granted a security interest, pledge, collateral assignment, mortgage or other collateral interest as security for obligations of the Borrower, including New Money Lender Collateral and Existing Lender Collateral.

2.    Summary of Collateral Interests.

a. Prior to the Closing of the New Loan, the Existing Lender has been granted and holds liens, security interests and other collateral interests in and to all assets of the Borrower.

b. As of the closing of the New Loan, and subject to the satisfaction of the terms and conditions set forth herein, the New Money Lender will have liens on and a security interest in the New Money Lender Collateral.

3.    Consent and Priority of Liens.

a.    The Existing Lender hereby consents to and approves the issuance of the New Note and granting of the New Money Liens to the New Money Lender by the Borrower.

b.    This Agreement is entered into pursuant to, and is conditioned upon, a financing order entered by the Court, in form and substance satisfactory to New Money Lender and Existing Lender.

c.    Lenders agree that at all times, whether before, after or during the pendency of any bankruptcy, reorganization or other insolvency proceeding involving the Borrower or any guarantor, and notwithstanding the priorities which would otherwise result from the order of the granting of any lien, or the order of filing or recording of any financing statements or mortgages, the priorities of all liens in favor of the Lenders on the Collateral shall be as follows:

i. With respect to the New Money Lender Collateral, the Existing Liens on the New Money Lender Collateral shall be and are hereby made fully, and in all respects, subordinated and junior to the New Money Lien in the New Money Lender Collateral held by the New Money Lender.

ii. The New Money Lender shall have no interest or lien in any Collateral other than the New Money Lender Collateral.

d.    The Lenders agree that, so long as the obligations under the New Loan are outstanding, the New Money Lender shall have a first priority, perfected security interest in and to the New Account (as defined in the Loan Agreement). The Existing Lender shall have a second priority perfected

{W2481917.5}

security interest in and to the New Account.  Until such time as the New Loan is paid in full, the Existing Lender shall have no right to sweep or otherwise take possession of any funds in the New Account.  The Lenders agree that the New Account shall be maintained solely for the purposes of:

i. Receiving advances made under the New Note; and

ii.  Receiving any and all payments made on accounts receivable included in the New Money Lender Collateral or otherwise resulting from the sale or disposition of any New Money Lender Collateral; and

iii. Receiving the proceeds of any loan made pursuant to the BFA Financing Commitment.

The Lenders agree that the New Money Lender shall have a first priority, senior interest in all amounts on deposit in the New Account and until the New Loan is paid in full, New Money Lender shall be entitled to payment from the New Account on a first priority basis notwithstanding any pledge, security interest, account control agreement or other interest Existing Lender may have in and to the accounts of the Borrower, including the New Account.

{W2481917.5}

4.      Priority and Procedure on Distribution of Proceeds.

a. In the event any Lender, or their respective successors, assigns, agents, employees, attorneys or designees, should receive, or otherwise come into possession or control of, any monies (or other property or interests of any kind) ("Proceeds") resulting from or relating to the sale, liquidation, casualty loss, assignment, transfer or other disposition of the Collateral, or otherwise receive any distribution of the Proceeds of any Collateral, whether by reason of exercise of remedies under any security agreements, mortgages, collateral assignments or other documents or agreements securing amounts owed from Borrower, or as a result of any liquidation, bankruptcy, arrangement, receivership, assignment for the benefit of creditors or any other action or proceeding involving the readjustment of the obligations and indebtedness of the Borrower (or, if applicable, any guarantor), or the application of the assets of the Borrower (or, if applicable, any guarantor) to the payment or liquidation thereof, or as a result of foreclosure or the dissolution or winding up of the Borrower's business (or, if applicable, any guarantor) or the sale of all or substantially all of Borrower's assets (or, if applicable, any guarantor), at any time during the term of this Agreement, then the Lender receiving Proceeds shall (unless otherwise restricted or prohibited by law) hold the Proceeds in trust for, and promptly pay over the same to, the Lender or parties entitled to receive such Proceeds in accordance with the priorities set forth in Section 3 of this Agreement.

b. For purposes of allocating Proceeds hereunder, the outstanding balance of a Lender's loan shall include any amount of principal and interest and costs thereon which is advanced after the date hereof, including all costs of collection, protective advances and costs of sale.

5.      Cross Default.   The parties agree that notwithstanding any terms or provisions of the promissory notes, loan agreements, security agreements or other documents or agreements governing the Existing Loans or the New Loan, a default or event of default under any one or more of the Existing Loans or New Loan shall constitute a default under each of the Existing Loans or New Loan.

6.      Proceeds.  A Lender's relative priority in Proceeds of Collateral, including insurance Proceeds, shall be determined based upon that Lender's relative priority in the asset from which such Proceeds arose.

7.      Collection.  If any one or more of the Lenders undertakes collection efforts after acceleration of its respective loan, it shall do so in an expeditious, commercially reasonable and prudent manner, and shall consult with, report to and account to the other Lenders upon request. All payments, Proceeds or other sums received or obtained including, without limitation, Proceeds of setoff, with respect to any Collateral shall be held and applied in accordance with the priorities set forth in Section 3 hereof and the procedures set forth in Section 4 hereof.

{W2481917.5}

8.     Exchange of Notices.  Each of the Lenders shall make reasonable efforts to provide the other Lender, as and when received or given, a copy of any demand, amendment, modification, waiver, replacement or supplement of or related to their respective agreements with the Borrower (or, if applicable, any guarantor).  No Lender shall have any liability to any other Lender for failure to comply with this section.

9.     Collateral Turnover.  In the event any Existing Lender has taken possession of Collateral in order to perfect its pledge, security interest or lien therein and such Existing Lender's loans to the Borrower are paid in full ("Paid Lender"), then the Paid Lender shall promptly, upon full payment of such indebtedness by Borrower, transfer, assign and deliver any and all Collateral in its possession or control to the other Lender, without returning possession of such Collateral to the Borrower.  The Borrower hereby consents to direct transfer and delivery of any and all such Collateral to the remaining Lender in order to perfect the remaining Lender's pledges, security interest or liens therein.

10.     Term.  This Agreement shall be irrevocable by the Lenders until all indebtedness, obligations and liabilities of the Borrower (and each guarantor) to either one of the Lenders has been paid and fully satisfied and all financing arrangements between the Borrower (and each guarantor) and either one of the Lenders has been terminated.

11.     Successors and Assigns.  This Agreement shall be binding upon, and shall inure to the benefit of, the Lenders hereto and their respective successors and assigns.  The term "Borrower" or "guarantor" as used herein shall also refer to the successors and assigns of the Borrower or guarantor, including, without limitation, any receiver, trustee, custodian or debtor-in-possession.

12.     Relationship of Parties.  This Agreement is entered into solely for the purposes set forth above, and no Lender assumes any responsibility to any other Lender to advise the other of information known to such Lender regarding the financial condition of the Borrower or any guarantor, or regarding the Collateral or the Existing Lender Collateral, or of any other circumstances bearing upon the risk of nonpayment of the obligations of the Borrower.  Each Lender shall be responsible for managing its relationship with the Borrower and any guarantor and no Lender shall be deemed the agent of any other Lender under this Agreement (provided that the Collateral Agent shall act as an agent for the Lenders identified herein in accordance with the terms hereof).  Except as otherwise expressly provided herein, each Lender may alter, amend, supplement, release, discharge or otherwise modify any terms of their respective loan agreements with the Borrower and any guarantor without notice to or consent of any other Lender, except no increases shall be made.

13.     No Third Lender Beneficiaries.  Nothing contained in this Agreement shall be deemed to indicate that this Agreement has been entered into for the benefit of any person or Lender.  It is specifically agreed that the Borrower shall have no rights hereunder.

{W2481917.5}

14. <u>Counterpart Originals</u>.  This Agreement may be executed in multiple counterpart originals which together shall constitute a single agreement.  The signature of any party on any one counterpart shall bind such party, even if no other party has signed the same counterpart.

15. <u>Amendment</u>.  This Agreement may be amended only with the written concurrence of each of the Lenders.

[SIGNATURE PAGE TO FOLLOW]

{N2481917.5}

**IN WITNESS WHEREOF,** the parties have hereunto executed this agreement as of the date first above written.

**WITNESS:**                    **EXISTING LENDER**

_____        By: _____
                               Its: 


**WITNESS:**                    **NEW MONEY LENDER**

_____        By: _____
                               Its: _____


_____        By: _____
                               Its: _____

{W2481917.5}

## <u>CONSENT</u>

The undersigned Borrower does hereby consent and agrees to be bound on behalf of itself and any successor in interest, including, without limitation, any trustee appointed in the Chapter 11 case or any subsequent Chapter 7 case, to the foregoing priority agreement:

**ISAACSON STRUCTURAL STEEL, INC.**

By: _____

Its: _____

Name: _____

**EXHIBIT**

_E_

tabbies®

**ISAACSON STRUCTURAL STEEL, INC.**
Case #11-12416
Cash Flow Budget - 10 Business Days
June 29, 2011 to September 30, 2011
PROJECTION

| | Total | 5 6/29/2011 | 6 6/30/2011 | 7 7/11/2011 | W/E 7/15/2011 | W/E 7/22/2011 | W/E 7/29/2011 | W/E 8/5/2011 | W/E 8/12/2011 | W/E 8/19/2011 | W/E 8/26/2011 | W/E 9/2/2011 | W/E 9/9/2011 | W/E 9/16/2011 | W/E 9/23/2011 | W/E 9/30/2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance 6/23/2011 | 83,195 | 83,195 | 82,095 | 80,995 | 467,139 | 751,896 | 829,193 | 413,473 | 302,696 | 300,117 | 476,298 | 730,362 | 838,014 | 866,014 | 874,314 | 892,014 |
| **Source of Funds** | | | | | | | | | | | | | | | | |
| Turner Rent | 10,500 | | | | | | 3,500 | | | | 3,500 | | | | | 3,500 |
| Bridge Loan | 500,000 | | | 500,000 | | | | | | | | | | | | |
| Receivables | 9,062,350 | | | | 873,611 | 22,482 | 651,985 | 1,413,321 | 960,000 | 960,000 | 960,000 | 960,000 | 800,000 | 800,000 | 800,000 | 800,000 |
| **Offsets:** | | | | | | | | | | | | | | | | |
| Infra | (3,523,212) | | | | (289,160) | (23,164) | (460,888) | (1,000,000) | (350,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) |
| Detailing | (530,000) | | | | | | (57,500) | | (57,500) | (57,500) | (57,500) | (60,000) | (60,000) | (60,000) | (60,000) | (60,000) |
| Erection | (645,777) | | | | (34,095) | | (4,622) | (27,400) | (65,319) | (64,041) | (14,411) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) |
| Materials | (2,103,000) | | | | | | (200,000) | (200,000) | (200,000) | (200,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) |
| Net Receivables to ISSI | 2,263,381 | | | | 549,756 | (702) | (91,325) | 128,421 | 377,181 | 377,181 | 375,459 | 290,000 | 140,000 | 140,000 | 140,000 | 140,000 |
| Total Source of Funds | 2,773,881 | 1,100 | | 500,000 | 549,756 | (702) | (91,325) | 71,571 | 128,421 | 377,181 | 375,459 | 290,000 | 140,000 | 140,000 | 140,000 | 143,500 |
| Less: Cash Disbursed | 2,583,305 | 1,100 | 1,100 | 113,856 | 265,000 | 122,000 | 127,895 | 182,348 | 210,000 | 127,895 | 182,348 | 182,348 | 122,000 | 122,000 | 122,000 | 122,000 |
| **Cash Balance** | 273,251 | 82,095 | 80,995 | 467,139 | 751,896 | 829,193 | 413,473 | 302,696 | 300,117 | 470,298 | 730,362 | 833,014 | 866,014 | 874,314 | 892,014 | 273,751 |
| **Cash Disbursed** | | | | | | | | | | | | | | | | |
| Passumade: AP Payment | | | | | 30,000 | | | | | | | | | | | |
| Insurance | 482,544 | 460 | 460 | 4,460 | 94,300 | 6,300 | 6,300 | 6,300 | 94,300 | 6,300 | 6,300 | 52,148 | 6,300 | 6,300 | 6,300 | 140,168 |
| **Payroll** | | | | | | | | | | | | | | | | |
| Payroll - Gross | 1,361,645 | | | 101,645 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 |
| Payroll Tax Liability - EE & ER | 97,111 | | | 7,111 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 |
| **Other Expenses** | | | | | | | | | | | | | | | | |
| Software Licenses | 25,000 | | | | 25,000 | | | | | | | | | | | |
| Gallagher Auditing Fees | 28,000 | | | | | | | | | | | 14,500 | | | | |
| Electricity | | | | | | | | 14,500 | | | | | | | | |
| NCIC | | | | | | | | | | | | | | | | |
| Northway Bank Loans-Vehicle/Equipment | 11,086 | | | | | | 3,665 | | | 3,665 | | | | | | 3,665 |
| Wells Fargo (2 Trucks only) | | | | | | | | | | | | | | | | |
| Vehicle Payments | | | | | | | | | | | | | | | | |
| Vehicle Repairs | | | | | | | | | | | | | | | | |
| Supplies | | | | | | | | | | | | | | | | |
| Freight | 37,800 | 600 | 600 | 600 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Office Supplies | 2,520 | 40 | 40 | 40 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Professional Development | | | | | | | | | | | | | | | | |
| Payment of Bridge Loan and Interest | 506,600 | | | | | | 2,200 | | | 2,200 | | | | | | 502,200 |
| **Total Cash Out** | 2,553,305 | 1,100 | 1,100 | 113,856 | 265,000 | 122,000 | 127,895 | 182,348 | 210,000 | 127,895 | 182,348 | 182,348 | 122,000 | 122,000 | 122,000 | 761,763 |